# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re: | Case No. 10-37144 |
| AMCORE FINANCIAL, INC., | *Chapter 11* |
| Debtor. | Hon. Susan Pierson Sonderby |
| | **Objection Deadline: August 9, 2011 at 4:00 p.m. (CST)** |
| | **Hearing Date: August 17, 2011 at 11:00 a.m. (CST)** |

**FIRST AND FINAL FEE APPLICATION OF SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AS COUNSEL TO THE DEBTOR, SEEKING FINAL ALLOWANCE AND PAYMENT OF COMPENSATION FOR SERVICES RENDERED AND REIMBURSEMENT OF CHARGES FOR THE PERIOD OF AUGUST 19, 2010 THROUGH JUNE 22, 2011**

| | |
|---|---|
| Name of Applicant: | Skadden, Arps, Slate, Meagher & Flom LLP |
| Authorized to Provide Professional Services to: | AMCORE Financial, Inc. |
| Date of Retention Order: | September 28, 2010 |
| Period for Which Compensation and Reimbursement Sought: | <u>Case Period</u>: August 19, 2010 through June 22, 2011 |
| Amount of Compensation Sought as Actual, Reasonable, and Necessary for Case Period: | Professional Fees:      $414,828<br>Expense Reimbursement:  $3,398<br>Total:          $418,226 |
| This is an/(a): | ___Interim   _X_ Final Application |

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP
George N. Panagakis (ARDC No.
06205271)
Justin M. Winerman (ARDC No. 6298779)
155 N. Wacker Drive
Chicago, Illinois  60606
(312) 407-0700

*/s/ George N. Panagakis*
Attorneys for Debtor
and Debtor-in-Possession

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re: | ) Case No. 10-37144 |
| | ) |
| AMCORE FINANCIAL, INC., | ) *Chapter 11* |
| | ) |
| Debtor. | ) Hon. Susan Pierson Sonderby |
| | ) |
| | ) **Objection Deadline: August 9, 2011 at 4:00** |
| | ) **p.m. (CST)** |
| | ) |
| | ) **Hearing Date: August 17, 2011 at 11:00 a.m.** |
| | ) **(CST)** |

**FIRST AND FINAL FEE APPLICATION OF SKADDEN, ARPS, SLATE,**
**MEAGHER & FLOM LLP AS COUNSEL TO THE DEBTOR, SEEKING**
**FINAL ALLOWANCE AND PAYMENT OF COMPENSATION FOR**
**SERVICES RENDERED AND REIMBURSEMENT OF CHARGES FOR**
**THE PERIOD OF AUGUST 19, 2010 THROUGH JUNE 22, 2011**

Skadden, Arps, Slate, Meagher & Flom LLP and its affiliated law practice entities ("Skadden"), counsel for AMCORE Financial, Inc., chapter 11 debtor and debtor-in-possession ("AMCORE," the "Debtor," or the "Company") in the above-captioned chapter 11 case (the "Chapter 11 Case"), submits this first and final application (the "Final Application") under 11 U.S.C. §§ 330 and 331 seeking final allowance and payment, from the Debtor's account, for services rendered and reimbursement of charges and disbursements incurred during the entirety of this Chapter 11 Case, for the period from August 19, 2010 through and including June 22, 2011 (the "Case Period"), in the amount of $414,828 in fees and $3,398 in charges and disbursements, for an aggregate amount of $418,226. In support of this Final Application, Skadden represents as follows:

## BACKGROUND

1.      On August 19, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.      On August 25, 2010, the Debtor filed its Disclosure Statement with Respect to the Plan of Liquidation of AMCORE Financial, Inc.

3.      On August 25, 2010, the Debtor filed its Plan of Liquidation of AMCORE Financial, Inc.

4.      On October 13, 2010, the Debtor filed its First Amended Disclosure Statement with Respect to the First Amended Plan of Liquidation of AMCORE Financial, Inc. (Docket No. 57) (the "Disclosure Statement").

5.      On December 14, 2010, the Debtor filed its Modified First Amended Plan of Liquidation of AMCORE Financial, Inc. (Docket No. 105) (the "Plan").

6.      On December 15, 2010 (the "Confirmation Date"), the Court entered its Findings of Fact, Conclusions of Law, and Order Confirming the Modified First Amended Plan of Liquidation of AMCORE Financial, Inc. (Docket No. 109) (the "Confirmation Order").

7.      The Effective Date of the Plan occurred on June 22, 2011.

8.      Between the Petition Date and the Effective Date, the Debtor remained as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

9.      No trustee or examiner has been appointed in this chapter 11 case.

10.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

11.     The statutory predicates for the relief requested herein are Sections 330 and 331 of the Bankruptcy Code, Rules 2016 and 2017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 5082-1 of the Local Bankruptcy Rules.

### RETENTION OF SKADDEN

12.     On August 25, 2010, the Debtor applied to the Court for an Order Under Bankruptcy Code Section 105, 327(a), and 329 and Bankruptcy Rules 2014 and 2016 Authorizing Employment and Retention of Skadden, Arps, Slate, Meagher & Flom LLP and Affiliated Law Practice Entities as Attorneys for Debtor and Debtor-in-Possession (the "Retention Application") to perform legal services under a general retainer that was necessary to enable the Debtor to faithfully execute its duties as debtor-in-possession including, among others, the following professional services to the Debtor:

> (a)     advise the Debtor with respect to its powers and duties as debtor and debtor-in-possession in the continued management and operation of its business;
>
> (b)     attend meetings and negotiate with representatives of creditors and other parties in interest and advise and consult on the conduct of the Chapter 11 Case, including all of the legal and administrative requirements of operating in chapter 11;
>
> (c)     take all necessary action to protect and preserve the Debtor's estate, including the prosecution of actions on its behalf, the defense of any actions commenced against the estate, negotiations concerning all litigation in which the Debtor may be involved and objections to claims filed against the estate;

(d)      prepare on behalf of the Debtor all motions, applications, answers, orders, reports, and papers necessary to the administration of the estate;

(e)      appear before this Court, any appellate courts, and the United States Trustee, and protect the interests of the Debtor's estate before such courts and the United States Trustee;

(f)      prepare and negotiate on the Debtor's behalf a plan of liquidation, disclosure statement, and all related agreements and/or documents, and take any necessary action on behalf of the Debtor to obtain confirmation of such Plan; and

(g)      perform all other necessary legal services and provide all other necessary legal advice to the Debtor in connection with this Chapter 11 Case.

13.      On September 28, 2010, this Court entered an Order Under Bankruptcy Code Section 105, 327(a), and 329 and Bankruptcy Rules 2014 and 2016 Authorizing Employment and Retention of Skadden, Arps, Slate, Meagher & Flom LLP and Affiliated Law Practice Entities as Attorneys for Debtor and Debtor-in-Possession (the "Retention Order")[1] authorizing the Debtor to employ Skadden as its counsel under the terms set forth in the Retention Application.

14.      In the Retention Application, the Debtor disclosed that Skadden's fees for professional services are based in part on its guideline hourly rates, which are periodically adjusted.[2] The Debtor also disclosed in the Retention Application that Skadden's charges

---

[1]      A copy of the Retention Order and the Retention Application including the supporting declaration can be found at Docket Nos. 51 and 24 respectively, and are incorporated herein as though fully set forth. In addition, the Retention Order incorporates the terms of an engagement agreement dated March 1, 2010, between Skadden and the Debtor (the "Engagement Agreement"), a copy of which is attached as Exhibit B to the Retention Application.

[2]      A chart showing a summary of the hours incurred and value of the services performed by each professional (partner, counsel, associate, and paraprofessional) is provided as Exhibit A. As set forth in the Engagement Agreement, billing rates are periodically reviewed and revised.

4

and disbursements are invoiced pursuant to Skadden's Policy Statement Concerning

Charges and Disbursements, a copy of which is attached to the Engagement Agreement.

Certain charges and disbursements are not separately charged under the bundled rate

structure as described in the Retention Application.

15.     Other than an arrangement between Skadden, Arps, Slate, Meagher & Flom

LLP and its affiliated law practices and their members, there is no agreement or

understanding between Skadden and any person for the sharing of compensation to be

received for services rendered in this case.

## OVERVIEW OF THE DEBTOR'S BUSINESS

16.     Prior to the Bank Closure (defined below), AMCORE was a registered bank

holding company incorporated under the laws of the State of Nevada in 1982.  As a bank

holding company, AMCORE was subject to regulations under the Bank Holding Company

Act of 1956, as amended, and was registered with the Federal Reserve Board.  AMCORE

acted as a registered bank holding company for its wholly owned subsidiary, AMCORE

Bank, N.A., a nationally chartered bank (the "Bank"), whose deposits were insured by the

Federal Deposit Insurance Corporation (the "FDIC") up to the maximum amount permitted

by law.  Prior to being closed, the Bank was subject to oversight and regulation by its

primary regulator, the Office of the Comptroller of the Currency (the "OCC").

17.     On April 23, 2010, the Bank was closed by the OCC (the "Bank Closure"),

and the FDIC was named receiver for the Bank.  The FDIC sold substantially all of the

assets of the Bank to Harris National Association ("Harris Bank").  In addition, Harris

Bank assumed all of the deposits of the Bank, excluding those from brokers.

## EVENTS LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASE

18.     The Company's financial difficulties primarily stem from the Bank Closure. The Bank's difficulties, in turn, stemmed from, among other things, the deteriorating global market, the credit crunch, and the economic conditions which began to accelerate in the second half of 2008.  As has been well documented, the United States financial and credit markets, including the residential housing market, experienced nearly unprecedented disruptions over the last couple of years.

19.     Generally, the severe downturn in global economic conditions, lack of confidence in the financial sector generally, increased volatility in the financial markets, reduced business activity, and the contraction of capital markets that ultimately resulted in difficulty obtaining available credit and increased borrowing costs all impaired the Company's and the Bank's liquidity and their ability to service their debt.

20.     More specifically, the Bank's service areas all experienced higher unemployment than was typical, and the entire Midwest continues to experience deterioration in the real estate markets, with tightened liquidity, lengthening of the sales cycle, and declining collateral values.  Falling home prices and increasing foreclosures and unemployment resulted in significant write-downs of asset values.  In addition, credit risk in the Bank's portfolio increased due to a concentration in commercial real estate loans with significant deterioration in asset quality and collateral values.  Declining value of real estate collateral supporting many construction and land development loans, commercial loans, and multi-family loans adversely impacted the Company's financial condition.

21.     AMCORE's principal asset and source of income was its investment in the

Bank.  Historically, liquidity had been provided to the Debtor through the Bank in the form

of dividends.  The Bank Closure had a significant adverse affect on AMCORE's liquidity,

capital resources, and financial condition.

22.     Accordingly, on the Petition Date, AMCORE filed a voluntary petition

under the Bankruptcy Code.

## SIGNIFICANT EVENTS DURING THE CASE PERIOD

23.     During the Case Period, Skadden assisted the Debtor in confirming its Plan

as quickly as possible, which the Debtor was able to do less than four months after the

Petition Date.

24.     In addition, Skadden spent time reviewing and analyzing issues related to

bankruptcy, banking, and other  regulatory matters involving the FDIC that typically arise

in bank holding company bankruptcy cases.  Specifically Skadden attorneys spent time (a)

analyzing issues in connection with potential FDIC actions (described in more detail below)

and (b) researching and analyzing other bank holding company chapter 11 cases for

pleadings and decisions relevant to this case.

25.     Based upon the actions of the FDIC in its receivership capacity in other

recent bankruptcy proceedings involving bank holding companies, it could be anticipated

that the FDIC might assert certain claims in this Chapter 11 Case, including a priority

claim under Bankruptcy Code section 507(a)(9) for alleged capital maintenance obligations

pursuant to section 365(o) of the Bankruptcy Code, claims to ownership over certain tax

and insurance refunds, claims to insurance policy proceeds, and certain rights to setoff,

among other claims (collectively, the "FDIC Claim").

26.      Ultimately, Skadden negotiated an innovative settlement with the FDIC on

behalf of the Debtor that was embodied in the Plan, and avoided the uncertainty, and time-

consuming nature, of litigation that has paralyzed debtors in other bank holding company

bankruptcy cases.  As a result, other general unsecured creditors will be able to get a

meaningful distribution under the Plan, and, they will get that distribution in a much

quicker manner than they might otherwise have been able to do, absent the FDIC

Treatment.

### REQUESTED FEES AND REIMBURSEMENT OF EXPENSES

27.      Throughout the Case Period, Skadden has worked closely with the Debtor

and its advisors to administer the estate and maximize the return for the Debtor's creditors.

Specifically, Skadden has played an important legal advisory role in counseling the Debtor

with respect to its wind down strategy, negotiating with the Debtor's key creditors,

including the FDIC and JPMorgan Chase Bank, N.A., and formulating, implementing, and

confirming the Plan during the Case Period.

28.      As a result of its efforts during the Case Period, Skadden now seeks

allowance of $414,828 in fees calculated at the applicable guideline hourly billing rates of

the Skadden professionals who have worked on the Chapter 11 Case and $3,398 in charges

and disbursements actually and necessarily incurred by Skadden while providing services

to the Debtor during the Case Period.  Detailed time entries for each Skadden professional

related to services performed during the Case Period are attached hereto as Exhibit B.

29.    This Final Application reflects a voluntary reduction in Skadden's requested fees and disbursements by $91,869.25, or approximately 22%.[3]

## SUMMARY OF SERVICES RENDERED BY SKADDEN DURING THE CASE PERIOD

30.    At the commencement of the Chapter 11 Case, Skadden created different matter numbers or subject-matter categories (the "Matter Categories") to which its professionals assigned the time billed by them, all of which are related to the tasks performed by Skadden professionals on behalf of the Debtor.[4]  All Skadden professionals kept a contemporaneous record of the time spent rendering such services and, consistent with the Local Bankruptcy Rules and guidelines of the Office of the United States Trustee, separated tasks in billing increments of one-tenth of an hour.  All of the services performed by Skadden have been legal in nature and necessary for the proper administration of the Chapter 11 Cases.

31.    Skadden professionals devoted approximately 80% of their time to the following matters, each of which was responsible for fees in excess of $25,000 during the Case Period:  Reorganization Plan/Plan Sponsors, Claims Administration (General), Case Administration, and Disclosure Statement/Voting Issues.

---

[3]    Skadden believes that the amounts requested in this Final Application are reasonable in relation to the services rendered during the Case Period.  The amounts requested are already reduced to reflect the client accommodations during the case described herein.  To the extent that a party objects to this Final Application, Skadden reserves the right to recapture such client accommodations and seek up to the full amount of fees actually incurred in connection with this engagement.

[4]    Exhibit C contains a table of all matter numbers used in this Chapter 11 Case.

32.     Skadden professionals devoted approximately 15% of their time during the Case Period to the following matters and incurred between $7,500 and $25,000 in fees for each such matter:  General Corporate Advice, Asset Analysis and Recovery, Creditor Meetings/Statutory Committees, Automatic Stay (Relief Actions), Retention and Fee Matters (SASM&F), and Tax Matters.

33.     Skadden professionals devoted the remainder of their time (approximately 5% in the aggregate) during the Case Period to the following matters and incurred less than $7,500 in fees for each such matter:  Reports and Schedules, Litigation (General), Employee Matters (General), Retention/Fee Matters/Objections (Others), U.S. Trustee Matters, and Executory Contracts (Personalty).  Set forth below, in descending order based on the fees expended, are descriptions of the areas in which Skadden professionals rendered its services.

<u>MATTERS GREATER THAN $25,000</u>

<u>Reorganization Plan/Plan Sponsors</u>

34.     One of the primary goals of the Debtor's efforts was to wind down its estate as efficiently as possible.  To that end, during the Case Period, Skadden professionals assisted the Debtor in the development, solicitation, confirmation, and implementation of the Plan on a time table that allowed the Debtor to go effective on its confirmed Plan merely ten months after the Petition Date.  During the ten month duration of this Chapter 11 Case, Skadden professionals devoted time to analyzing and crafting the Plan and to negotiating, drafting the pleadings, and implementing the component parts necessary to achieve such a goal.

35.     In addition, Skadden professionals participated in numerous Plan strategy

session with the Debtor's management.  During these strategy sessions, Skadden advised

the Debtor with respect to the legal requirements of a plan under the Bankruptcy Code.  In

addition, the Debtor, with the assistance of Skadden, worked with representatives of

various creditors in addressing components of the Plan structure in order to consider their

comments and other developments in this Chapter 11 Case.

36.     The Debtor initially filed a plan of liquidation and a disclosure statement

shortly after the Petition Date.  After a preliminary disclosure statement hearing before the

Court, and after taking into consideration additional comments from parties-in-interest, the

Debtor filed the Disclosure Statement with the Court on October 13, 2010.  On December

14, 2010, the Debtor filed the Plan.

37.     The Debtor, with the assistance of Skadden, reached a number of

settlements embodied in the Plan, including settlements with the FDIC, the ERISA

Litigants, and certain holders of the TRUPS (defined below).

38.     Moreover, Skadden drafted the Liquidation Trust Agreement, which was an

exhibit to the Plan.

39.     The Plan was overwhelmingly accepted by nearly all parties entitled to vote,

in all voting classes.  Moreover, as a result of the efforts by the Debtor and Skadden, only

two (2) objections to confirmation of the Plan were filed.  Skadden conducted negotiations

with the objecting parties, and ultimately, Skadden attorneys were able to consensually

resolve one of the formal objections, as well as an informal objection, resulting in an uncontested confirmation hearing.[5]

40.      In preparation for the confirmation hearing, Skadden also devoted time to provide a record that evidenced the satisfaction of each element required by the Bankruptcy Code for confirmation.  Accordingly, Skadden prepared appropriate affidavit testimony with respect to the Plan and the exhibits to the Plan.  Ultimately, the Plan was confirmed on December 15, 2010

41.      During the post-confirmation, pre-effective date time period Skadden assisted the Debtor in its completion of various tasks, including drafting the notice of the occurrence of the Effective Date and the administrative claims bar date and coordinating the occurrence of the Effective Date through discussions with representatives of the Debtor and various creditors.

42.      In connection with the foregoing services, Skadden professionals expended 170.2 hours during the Case Period for which Skadden seeks compensation of $124,697. A general breakdown of services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| William R. Kunkel, Partner | 10.6 | $10,548 |
| George N. Panagakis, Partner | 72.1 | $68,352 |

---

[5]   The Court overruled an objection by a shareholder who was seeking to get paid despite no legal or cognizable basis for such claim.

| | | |
|---|---|---|
| Jonathan G. Pfleeger, Associate | 1.7 | $1,071 |
| Justin M. Winerman, Associate | 82.3 | $43,692 |
| Paraprofessionals | 3.5 | $1,034 |
| **Total:** | **170.2** | **$124,697** |

Claims Administration

43.     During the Case Period, Skadden professionals devoted time to certain claims administration matters.  Skadden explained to the Debtor the importance of establishing a bar date as soon as possible after filing the case so that the Debtor could know of all outstanding prepetition claims, and, thus, Skadden drafted the bar date motion (the "Bar Date Motion").[6]

44.     On August 25, 2010, the Bankruptcy Court entered an order (the "Bar Date Order") establishing October 11, 2010 as the deadline for filing Claims (the "General Bar Date"), except for Claims (a) based on the rejection of executory contracts and unexpired leases, (b) Claims impacted by an amendment to the Debtor's Schedules, and (c) Claims by governmental units as defined in the Bankruptcy Code.  The Bar Date Order also established February 17, 2011 as the deadline for governmental units, as defined in the

---

[6]     A copy of the Bar Date Motion can be found at Docket No. 9.

Bankruptcy Code, to file proofs of claim (the "Governmental Bar Date" together with the

General Bar Date, the "Bar Dates").

45.     As of the Bar Date, more than 30 proofs of claim were Filed against the

Debtor.  Prior to the Effective Date, Skadden assisted the Debtor in the process of

preliminarily reviewing, researching case law, and, where necessary, objecting to

prepetition claims.  To that end, the Debtor filed an omnibus objection, objecting to four

unique claims, which were all disallowed by the Bankruptcy Court.  In addition, Skadden

helped the Debtor reach stipulations resolving four other claims as of the Effective Date.[7]

Skadden working with the Debtor also was able to get directors and officers to estimate

their unliquidated claims for indemnification at zero.  By resolving these disputed claims

prior to the Effective Date, the Debtor is able to make a timely distribution to general

unsecured creditors.

46.     In addition, Skadden professionals researched various legal issues related to

certain claims, including novel and complex issues related to the FDIC Claim that involves

still-developing case law.  To that end, Skadden informed the Debtor of various novel

issues arising under sections 365(o) and 507(a)(9) of the Bankruptcy Code as well as

recent decisions from bank holding company cases on ownership of tax refunds and

insurance policy proceeds, among other issues.

---

[7]     The stipulations can be found at Docket Nos. 141-144.

47.     In addition, the Debtor had certain claims against the Bank and/or the FDIC.
Consequently, Skadden helped the Debtor draft and file a proof of claim in the receivership
(the "Receivership Proof of Claim").

48.     Thereafter, Skadden, on behalf of the Debtor, and the FDIC engaged in
fruitful negotiations with the aim of consensually resolving any FDIC Claim and the
Receivership Proof of Claim.  As a result of those conversations, Skadden worked with the
Debtor to devise the FDIC Treatment to consensually resolve the FDIC Claim, saving the
Debtor and its creditors time and money.  In fact, absent the FDIC Treatment, if the FDIC
were to prevail on a theory that it was entitled to a priority claim, general unsecured
creditors would have likely been left with no recovery.

49.     Moreover, the Skadden negotiated settlements with various other creditors
of the Debtor.  Specifically, Skadden worked with the Debtor to resolve issues over the
classification of certain ERISA claims (the "ERISA Claims").  Prior to the Petition Date,
two separate ERISA lawsuits were filed against the Debtor and others by certain ERISA
litigants (collectively, the "ERISA Litigants").  On February 22, 2011, Skadden drafted
two motions seeking orders subordinating the ERISA claims under section 510(b) of the
Bankruptcy Code (the "Subordination Motions").[8]  Prior to and after the Subordination
Motions were filed, Skadden negotiated with bankruptcy counsel for the ERISA Litigants.
Ultimately, counsel for the ERISA Litigants agreed to subordinate the claims for the
ERISA Litigants.  Because of the potential magnitude of the ERISA Claims, the Debtor

---

[8]     A copy of the Subordination Motions can be found at Docket Nos. 125 and 126.

was not able to make distributions until this issue was resolved.  On April 12, 2011, the

Bankruptcy Court entered an Order approving the stipulation.[9]  As a result of the

stipulation between the Debtor and the ERISA Litigants, the Effective Date occurred on

June 22, 2011, and the Debtor is able to make distributions under the Plan.

50.     In connection with the foregoing services, Skadden professionals expended

115 hours for which Skadden seeks compensation of $72,159.  A general breakdown of

services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| William R. Kunkel, Partner | 12 | $11,940 |
| George N. Panagakis, Partner | 11.3 | $11,146 |
| Justin      M.      Winerman, Associate | 89.6 | $48,453 |
| Paraprofessionals | 2.1 | $620 |
| **Total** | **115** | **$72,159** |

---

[9]     The order and stipulation can be found at Docket No. 141.

Case Administration

51.    Skadden professionals also devoted significant resources to the efficient and
expeditious administration of the Chapter 11 Case during the Case Period.  Work
performed under this category may be grouped as follows: (a) general preparation for, and
attendance at, court hearings; (b) communications with creditors and other parties-in -
interest; (c) service and publication of notices; and (d) general case administration.

52.    Furthermore, Skadden professionals advised the Debtors' management of
the Debtor's rights and duties as debtor-in-possession, noting proscribed, permitted, and
required conduct.  Skadden professionals frequently advised the Debtor with respect to
specific business questions posed by management and by events occurring in the Chapter
11 Case.  Part of the advice in this regard involved the participation of Skadden in periodic
planning and strategy conferences with the Debtor's management team.

53.    To assist the Debtor in continuing to perform its fiduciary duties, Skadden
professionals worked with the Debtor to implement procedures for the Debtor to operate its
business in accordance with the requirements of the Bankruptcy Code.  Skadden
professionals reviewed certain of the Debtor's proposed expenditures, contractual
relationships, dispositions of property, and other transactions to aid the Debtor's in
evaluating whether the contemplated transactions were within the ordinary course of
business, or were outside the ordinary course of business and required Court approval.

54.    In addition, Skadden paraprofessionals also docketed all pleadings and
orders filed in the Chapter 11 Case and worked with the Debtor's claims and noticing agent

Kurtzman Carson Consultants LLC ("KCC") to ensure that all entities entitled to notice were kept apprised of significant events during the Chapter 11 Case.

55.     In connection with the foregoing services, Skadden professionals expended 113.8 hours for which Skadden seeks compensation of $61,640.  A general breakdown of services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|---|---|---|
| William R. Kunkel, Partner | 14.8 | $14,727 |
| George N. Panagakis, Partner | 9.3 | $8,804 |
| Justin M. Winerman, Associate | 51.5 | $26,837 |
| Paraprofessionals | 38.2 | $11,272 |
| **Total** | **113.8** | **$61,640** |

Disclosure Statement/Voting Issues

56.     During the Case Period, Skadden devoted substantial time to the preparation of the Disclosure Statement, and to evaluating various voting and tabulation issues with respect to the Plan.  Skadden consulted with the Debtor on a frequent basis to gather the information necessary to ensure that the Disclosure Statement would include all factual and legal content necessary to satisfy the "adequate information" requirement of section 1125 of the Bankruptcy Code.  In this regard, Skadden attorneys, working with the Debtor, reviewed, analyzed, researched, and prepared adequate disclosures of subjects, including,

without limitation, (a) the Debtor's corporate structure and business operations, (b) the

prepetition capital structure of the Debtor, (c) developments in the Chapter 11 Case, (d)

secured, priority, and general unsecured claims, (e) executory contracts, (f) tax issues, (g)

classification issues, (h) solicitation procedures, and (i) notice issues.

57.     During the Case Period, to prepare for the process of soliciting votes with

respect to the Plan and seeking approval of the Disclosure Statement, Skadden attorneys

began drafting notices for distribution and publication with respect to the Disclosure

Statement and Plan confirmation hearings, as well as drafting a motion to approve the

Disclosure Statement,[10] which also provided the procedural foundation for soliciting votes

from creditors for acceptance or rejection of the Plan.

58.     Moreover, Skadden spent time analyzing issues related to voting and

solicitation of the holders of the Debtor's junior subordinated debentures and related Trust

Preferred Securities (the "TRUPS").

59.     No objections were filed to the Disclosure Statement, and on October 14,

2010, the Court approved the adequacy of the Disclosure Statement and the Solicitation

Procedures Motion.  Following the approval of the Solicitation Procedures Motion, copies

of the Plan solicitation materials were mailed to parties-in-interest, and along with the

solicitation package, such parties either received a ballot or a notice as to why they were

not entitled to vote on the Plan.  Following the mailing of the solicitation materials,

---

[10]   Motion for Order (I) Approving the Disclosure Statement and the Form and Manner of Notice of Hearing; (II) Setting a Hearing Date for Confirmation of the Plan and Related Hearing Deadlines; and (III) Approving Noticing, Voting, and Related Solicitation Procedures (Docket No. 38) (the "Solicitation Procedures Motion")

Skadden professionals handled various inquiries from recipients regarding the Solicitation

Procedures, and coordinated the tabulation of the ballots with KCC.

60.     In connection with the foregoing services, Skadden professionals expended

111 hours during the Case Period for which Skadden seeks compensation of 60,650.  A

general breakdown of services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| George N. Panagakis, Partner | 7.3 | $6,899 |
| Karen M. Lee, Counsel | 1.6 | $1,273 |
| Jonathan G. Pfleeger, Associate | 6.8 | $4,130 |
| Justin M. Winerman, Associate | 90.3 | $46,873 |
| Paraprofessionals, Associate | 5 | $1,475 |
| **Total:** | **111** | **$60,650** |

MATTERS BETWEEN $7,500 AND $25,000

General Corporate Advice

61.     Skadden devoted time during the Case Period to advising the Debtor on

general corporate governance issues.  Skadden professionals have, among other things,

participated in meetings of the Debtor's Board of Directors, which required Skadden to

prepare materials for distribution and discussion.  In light of the transactions that were

contemplated and pursued during the Case Period, the Board of Directors met regularly, at which time Skadden provided them with advice and assistance. In addition, Skadden drafted corporate documents, including an 8-K announcing the bankruptcy filing.

62.　　In connection with the foregoing services, Skadden professionals expended 29.9 hours for which Skadden seeks compensation of $24,802. A general breakdown of services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| William R. Kunkel, Partner | 14.9 | $14,877 |
| George N. Panagakis, Partner | 4.3 | $4,064 |
| Alison M. Rhoten, Associate | 2.6 | $1,768 |
| Megan J. Baier, Associate | 0.9 | $473 |
| Justin M. Winerman, Associate | 6.5 | $3,413 |
| Paraprofessionals | 0.7 | $207 |
| **Total:** | **29.9** | **$24,802** |

Asset Analysis and Recovery

63.　　Skadden devoted time during the Case Period to analyzing issues related to the Debtor's recovery of various prepetition and postpetition amounts owed to the Debtor. Specifically, Skadden drafted a tolling agreement to toll the statute of limitations by which

the Debtor's estate could bring certain causes of action. Moreover, Skadden helped the

Debtor monetize certain of its assets for distribution to creditors. In addition, Skadden

advised the Debtor with regard to issues related to property of the estate.

64. In connection with the foregoing services, Skadden professionals expended

17.1 hours for which Skadden seeks compensation of $13,930. A general breakdown of

services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|---|---|---|
| William R. Kunkel, Partner | 7.6 | $7,561 |
| Fitzgerald T. Bramwell, Associate | 8.8 | $5,984 |
| Justin M. Winerman, Associate | 0.7 | $385 |
| **Total** | **17.1** | **$13,930** |

<u>Creditor Meetings/Statutory Committees</u>

65. This category of time relates to meetings with creditor constituencies and

their legal and financial advisors. Thus, on September 2, 2010, shortly after

commencement of this Chapter 11 Case, Skadden professionals advised the Debtor with

respect to, and attended the organizational meeting conducted by the U.S. Trustee.

66. In addition, on September 23, 2010, Skadden professionals advised the

Debtor with respect to, and attended the creditor's committee meeting. Ultimately, it was

decided no creditor's committee would be appointed in this Chapter 11 Case.

67.    In connection with the foregoing services, Skadden professionals expended 13.6 hours for which Skadden seeks compensation of $12,188.  A general breakdown of services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| William R. Kunkel, Partner | 3.5 | $3,483 |
| George N. Panagakis, Partner | 8.1 | $7,655 |
| Justin M. Winerman, Associate | 2 | $1.050 |
| **Total** | **13.6** | **$12,188** |

Automatic Stay (Relief Actions)

68.    During the Chapter 11 Case, the directors and officers of the Company sought authority from this Court to lift the automatic stay, to the extent necessary, to have access to the proceeds of certain director and officer insurance policies.  Specifically, on December 5, 2010, ERISA counsel for the directors and officers filed the Insured Persons' Motion to Lift Stay to Advance Defense Costs Under Insurance Policy (Docket No. 94) (the "Lift Stay Motion").  Prior to ERISA counsel for the directors and officers ("ERISA Defense Counsel") filing the Lift Stay Motion, Skadden worked closely with the Debtor and ERISA Defense Counsel to coordinate the drafting, filing, and consensual terms of the Lift Stay Motion.

69.     In addition, Skadden advised the Debtor regarding the implications of the automatic stay on certain litigation pending on the Petition Date and the Debtor's rights with respect thereto.

70.     In connection with the foregoing services, Skadden professionals expended 13 hours for which Skadden seeks compensation of $8,507.  A general breakdown of services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| William R. Kunkel, Partner | 1.7 | $1,692 |
| George N. Panagakis, Partner | 2.1 | $1,985 |
| Justin M. Winerman, Associate | 9.2 | $4,830 |
| **Total:** | **13** | **$8,507** |

Retention/Fee Matters (SASM&F)

71.     During the Case Period, Skadden professionals devoted time to begin drafting this Final Application for final approval of Skadden's fees and expenses during the Case Period.  In connection with the Final Application, Skadden also prepared and reviewed detailed monthly compensation invoices for services rendered by Skadden on behalf of the Debtor.

72.     In preparation for this Final Application, Skadden has prepared detailed monthly compensation invoices for distribution.  Skadden's monthly invoices are comprehensive for the benefit of the Debtor, the U.S. Trustee, and other parties in interest.

However, because the Debtor is often engaged in negotiations, litigation, or matters which are otherwise confidential, Skadden must spend time examining each time entry to ensure that it is preserves the Debtor's confidences.

73.     In connection with the foregoing services, Skadden professionals expended 13.4 hours for which Skadden seeks compensation of $8,035.  A general breakdown of services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| George N. Panagakis, Partner | 2 | $1,940 |
| Justin M. Winerman, Associate | 11.4 | $6,095 |
| **Total** | **13.4** | **$8,035** |

Tax Matters

74.     Skadden continued to assist the Debtor in analyzing and dealing with various issues and circumstances regarding debtor-in-possession tax issues.  In particular, Skadden attorneys conducted tax due diligence and analyzed the taxation issues in connection with, among other things, the sale of certain of the Debtor assets during the Case Period.  As part of its representation of the Debtor, Skadden also devoted time to analyzing tax issues in connection with the Debtor's Disclosure Statement and Plan.  In addition, Skadden attorneys reviewed the relevant tax aspects of the Plan and Liquidation Trust Agreement in order to satisfy the Debtor's requirement to adequately disclose the numerous tax implications of the Debtor's Plan in the Disclosure Statement.

75.     In connection with the foregoing services, Skadden professionals expended 9.3 hours for which Skadden seeks compensation of $7,572.  A general breakdown of services rendered during the Case Period is as follows:

| Name | Total Hours | Total Value |
|------|-------------|-------------|
| Jody J. Brewster, Partner | 0.4 | $398 |
| William R. Kunkel, Partner | 1.5 | $1,493 |
| Maxwell M. Miller, Partner | 3.8 | $3,781 |
| Matthew J. Hofheimer, Associate | 3.2 | $1,680 |
| Justin M. Winerman, Associate | 0.4 | $220 |
| **Total:** | **9.3** | **$7,572** |

### MATTERS LESS THAN $7,500

76.     During the Case Period, Skadden professionals also devoted time to, among other things, (a) researching litigation issues raised by creditors during the case; (b) assisting the Debtor in certain issues arising with the retention of professionals during the Chapter 11 Case; and (c) reviewing, analyzing, and advising the Debtor concerning the Debtor's executory contracts.

77.     In connection with the foregoing services, Skadden professionals expended 33.8 hours, in the aggregate, for which Skadden seeks compensation of $20,648.  A general breakdown of services rendered during the Case Period is as follows:

| Matter Name | Total Hours | Total Value |
|---|---|---|
| Reports and Schedules | 13.9 | $7,116 |
| Litigation (General) | 9.7 | $5,856 |
| Employee Matters (General) | 5.1 | $3,341 |
| Retention Fee Matters (Others) | 2.6 | $2,374 |
| U.S. Trustee Matters | 2.2 | $1,815 |
| Executory Contracts (Personalty) | 0.3 | $146 |
| **Total** | **33.8** | **$20,648** |

78.     In addition to the fees incurred by Skadden during the Case Period, Skadden's charges and disbursements during that time are reasonable and are consistent with those incurred by other bankruptcy practitioners in other chapter 11 cases of similar size in this and other districts.  A general description of the material charges and disbursements incurred by Skadden during the Case Period is immediately below.

79.     <u>Computer Legal Research.</u>  Skadden charges for on-line computer research, such as Lexis-Nexis and Westlaw, at the actual vendors' invoice amounts, which amounts have been reduced by discounts Skadden receives from its vendors.  Skadden is billed monthly by Lexis-Nexis and Westlaw for actual use of their services and not at a flat billing rate.  Skadden maintains all Lexis-Nexis and Westlaw charges on a per-client basis. With respect to on-line research, Skadden professionals spent time researching various issues in connection with the drafting of the various pleadings and the claims resolution process, including the FDIC Claim.

80.     Reproduction and Document Preparation.  As disclosed in the Engagement Agreement, Skadden charges 10 cents per page for photocopying performed in-house, while photocopying by outside vendors is billed to the Debtor at the actual invoice amount.

81.     Courier/Express Delivery/Postage.  Skadden charges the Debtor for outside messenger and express carrier services at the actual vendors' invoice amount which frequently involved discounts negotiated by Skadden.  Postage is charged at actual U.S. mail rates.  On certain occasions, internal staff may be required to act as messengers for whom the Debtor is charged a standard rate for their time.  In order to meet certain court-imposed deadlines, it was necessary to provide notice to parties as quickly as possible. Therefore, during the Case Period, Skadden professionals incurred various charges for courier, express delivery, and postage.

82.     Outside Research Services.  Skadden charges the Debtor for outside research services based on the actual vendors' invoice amount.  These invoices relate to expenses incurred by Skadden in reviewing and accessing the pleadings filed in this case through this Court's Pacer System.

83.     Telecommunications.  Skadden does not charge the Debtor for local telephone calls or facsimile services.  Long distance telephone calls made from Skadden offices are charged to the Debtor based on applicable phone rates and are allocated among the Matter Categories based on the hours worked by professionals on such Matter Categories.

## RELIEF REQUESTED

84.     Skadden submits this Final Application covering the Case Period.  In keeping with Skadden's commitment to self-policing its fees, charges, and disbursements, Skadden voluntarily reduced its fees by $91,869.25.  Accordingly, by this final application, Skadden is requesting final allowance of the payment of $414,828 in fees and the reimbursement of $3,398 in expenses, for an aggregate amount of $418,226.

85.     Allowance of Professional Fees. During the Case Period, attorneys and paraprofessionals at Skadden billed an aggregate of 640.1 hours reflected in this Final Application working on matters concerning the Debtor's Chapter 11 Case.  Of such time spent, 195.2 hours were spent by partners, 1.6 hours were spent by counsel, 391.6 hours were spent by associates, and 51.7 hours were spent by paraprofessionals.

86.     Reimbursement of Charges and Disbursements. As disclosed in the Retention Application, it is Skadden's standard policy to charge its clients in all areas of practice for certain charges and disbursements incurred in connection with such clients' cases.  The charges and disbursements charged to clients include, among others, charges for messenger services, photocopying, court fees, travel expenses, postage for large mailings, long distance telephone, computerized legal research, investigative searches, and other charges customarily billed by law firms.  Certain charges and disbursements are not separately charged for under the bundled rate structure as described in the Engagement Agreement.

87.     Skadden has attempted to minimize the charges and disbursements associated with the Debtor's Chapter 11 Case, particularly for items such as reproduction

and delivery.  In fact, during the Case Period, Skadden disbursed an aggregate amount of

$3,398 for actual and necessary charges and disbursements in the rendition of professional

services in the Chapter 11 Case, and requests that it be reimbursed therefore.

### REASONABLENESS OF FEES, CHARGES, AND DISBURSEMENTS

88.    Section 330 of the Bankruptcy Code governs compensation of professionals

in a bankruptcy case and provides that, when determining the amount of reasonable

compensation to award to a professional, the Court should consider the nature, extent, and

value of the services to the bankrupt estate and all other relevant factors.  11 U.S.C.

§ 330(a)(3).

89.    In addition, Bankruptcy Rule 2016 provides that "an entity seeking interim

or final compensation for services or reimbursement of necessary expenses, from the estate

shall file an application setting forth a detailed statement of (1) the services rendered, time

expended and expenses incurred, and (2) the amounts requested."  Fed. R. Bankr. P.

2016(a).

90.    Courts in this District have stated that "[i]n reviewing fee applications, the

bankruptcy court must address three issues: were the services that are the subject of the

application properly compensable; if so, were they actual and necessary; if so, how will

they be valued?"  In re Lifschultz Fast Freight, 140 B.R. 482, 485 (Bankr. N.D. Ill. 1992)

citing In re Wildman, 72 B.R.. 700, 704 (Bankr. N.D. Ill. 1987).

91.    In addition, with respect to expenses, courts in this District have required

that an "[a]pplication should contain a detailed list of expenses including the date, the type

and the amount."  In re Convent Guardian Corp., 103 B.R. 937, 939 (Bankr. N.D. Ill. 1989).

In determining whether an expense is necessary, this Court has stated that "an expense is necessary if it was incurred because it was reasonably needed to accomplish the proper representation of the client." Id.

92.     This Final Application meets these requirements.  First, Skadden's services are properly compensable.  The Court entered the Retention Order pursuant to 11 U.S.C. §§ 327(a) and 329 authorizing the retention of Skadden as attorneys for the Debtor. Further, this Final Application is being properly filed pursuant to 11 U.S.C. § 330. Therefore, Skadden' services are properly compensable.  See In re Lifschultz, 140 B.R. 482, 485 (court found that where law firm was properly retained and law firm filed appropriate fee application, law firm's services were "properly compensable").

93.     Second, compensation is proper for services that are actual and necessary. The Court found that "[s]ervices necessary under section 330 are those services that aid the professional's client in fulfilling its duties under the Code." Id.  Further, "[n]ecessary services have always included services that aid in the administration of the case and help the client fulfill duties under bankruptcy law, whether or not those services result in a monetary benefit to the estate." Id.  The services provided by Skadden were actual and necessary.  As set forth in this Final Application, Skadden's attorneys have provided multi-disciplinary services to the Debtor on a frequent basis.  Skadden's services have assisted the Debtor to engage in an extensive negotiation process with the FDIC, while attending to the needs of its other creditors.

94.     Third, "[o]nce the court has determined that the services for which compensation is sought were properly compensable and actual and necessary, it must

determine the value of those services." Id. at 488.  That is, "the court must evaluate what

the 'actual, necessary services' were worth to the client, based upon the five criteria listed

in section 330(a)(1)." Id. at 488.  In accordance with the factors enumerated in 11 U.S.C.

§ 330, the amount requested herein by Skadden is fair and reasonable, and fairly represents

the value the Debtor received from Skadden's services, given: (i) the nature of the

bankruptcy case, (ii) the novelty and complexity of the bankruptcy case, (iii) the time and

labor required to represent the Debtor effectively, (iv) the time limitations imposed by the

bankruptcy case, (v) the nature and extent of the services rendered, (vi) Skadden's

experience, reputation, and ability, (vii) the value of Skadden's services, and (viii) the cost

of comparable services other than in a case under title 11 of the United States Code.

95.   Nature, complexity, and duration of the case.  To maximize the value of the

estate, after extensive analysis of the Debtor's business, the Debtor and its professionals

pursued a fast-track strategy, with the goal of achieving the maximum value for the

Debtor's assets, resulting in the Debtor's emergence from chapter 11 less than one year

after filing.  Skadden professionals worked with all of the Debtor's constituents to reach

resolutions with certain key creditors, including the FDIC, the ERISA Litigants, and

certain holders of TRUPS, among others.  This required negotiations, often involving

novel issues that are just now being litigated across the country in a number of similar

bank holding company bankruptcy cases.  The negotiations ultimately resulted in

settlements that obviated the need for costly, risky, and time-consuming litigation that is

eating away at the estates of many other bank holding companies in bankruptcy.

Consequently, the Debtor and all of its creditors (some of whom may not have been

entitled to any recovery if the FDIC had successfully litigated its claim instead of settling with the Debtor) benefited, and the Debtor was able to confirm a Plan less than four months after the Petition Date.

96.     Skadden professionals have assisted the Debtor by employing a streamlined structure that consisted of a small, core team familiar with the Debtor's capital structure and bankruptcy goals.  This aggressive timetable required Skadden and other professionals involved in the Chapter 11 Case to use every effort to seek to work quickly and efficiently in assisting the Debtor in meeting those goals.

97.     <u>Experience of Skadden.</u>  The experience of Skadden's attorneys has also benefited the estate.  Skadden is among the largest firms and has one of the largest restructuring groups in the country.  As more fully set forth in the Retention Application, Skadden's restructuring attorneys and attorneys from other practice areas have extensive knowledge and experience in dealing with the multitude and fast-paced issues that arise in similar chapter 11 proceedings.  Accordingly, Skadden's depth of experience in chapter 11 matters has insured that a number of pressing matters could be addressed promptly.

98.     <u>Comparable services</u>.  Skadden's rates are consistent with rates charged to other clients in non-bankruptcy matters.  Moreover, its rate structure was disclosed clearly in its Retention Application, which the Court approved, and as to which no constituents objected.

99.     The amounts sought by Skadden are consistent with the fees, charges, and disbursements incurred by other chapter 11 debtors in cases of similar size, complexity, and duration.  Accordingly, the cost of comparable services supports the Final Application,

and the services performed during the Case Period more than warrant the allowance of compensation, particularly in view of the results achieved.

100.    <u>Compliance with Guidelines</u>. Skadden believes that this Final Application, together with the attachments hereto, substantially complies in all material respects with the United States Trustee Guidelines for Reviewing Applications for Compensation and Reimbursement of Expenses Filed Under 11 U.S.C. § 330. To the extent this Final Application does not comply in every respect with the requirements of such guidelines, Skadden respectfully requests a waiver for any such technical non-compliance.

[Remainder of Page Intentionally Left Blank]

WHEREFORE, Skadden respectfully requests that the Court (a) enter an order, substantially in the form of Exhibit D, permitting final allowance and payment for services rendered and reimbursement of charges and disbursements incurred during the Case Period, from August 19, 2010 through June 22, 2011, in the amount of $414,828 in fees and $3,398 in charges and disbursements, and (b) grant it such other and further relief as is just and equitable under the circumstances.

Dated: Chicago, Illinois
       July 20, 2011

/s/ George N. Panagakis
George N. Panagakis (ARDC No. 06205271)
Justin M. Winerman (ARDC No. 6298779)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
155 North Wacker Drive
Chicago, Illinois  60606
(312) 407-0700

Counsel for Debtor and
Debtor in Possession